**Elsie M. LINGHAM, Plaintiff,**

v.

**Ronald Lee HARMON, Defendant.**

**Civ. A. No. M–79–1704.**

United States District Court,
D. Maryland.

Nov. 14, 1980.

Elbert R. Shore, Jr., Rockville, Md., for plaintiff.

Walter L. Samet, Baltimore, Md., for defendant.

MEMORANDUM OPINION

JAMES R. MILLER, Jr., District Judge.

In this case, the court has decided that the two children of the decedent, Audrey Harmon, rather than her estranged husband, are properly the beneficiaries of a group life insurance policy. The facts and law compelling this result are summarized below in this Memorandum Opinion which shall constitute the court's Findings of Fact and Conclusions of Law, pursuant to Rule 52, F.R.Civ.P. The court has previously determined that it has jurisdiction by virtue of diversity of citizenship between the stakeholder, The Connecticut General Life Insurance Company, and the claimants of the proceeds of the life insurance policy in this interpleader action, Rule 22(1), F.R. Civ.P.; 28 U.S.C. § 1332. *See* Paper No. 9.

### I. Facts

The decedent, Mrs. Audrey E. Harmon, while an employee of the Housing Opportunity Commission of Montgomery County, Maryland, was an insured under a group life insurance policy No. 0250574–01, issued to employees of Montgomery County, Maryland by Connecticut General Life Insurance Company. Under the terms of the policy:

"A new beneficiary may be designated from time to time by filing a written request therefor on a form satisfactory to the insurance company and signed by the employee .... When, however, the change has been received, whether the employee is then living or not, it will take effect as of the date of the execution of the written request therefor ...."

The policy further provides that the consent of the beneficiary is not required to change the beneficiary.

Mrs. Harmon began employment with the Montgomery County government on August 2, 1976, and at that time designated her husband, Ronald Lee Harmon, with whom she was then living, as the beneficiary under the policy. Mrs. Harmon had two children from a prior marriage who also lived with her, being Rhonda Tyler, born on October 15, 1962, and James, a/k/a Jay Tyler, now age 15.

Mrs. Harmon separated from Ronald Lee Harmon in October, 1976. Thereafter, she lived separate and apart from Ronald Lee Harmon until her death. Her children, Rhonda and Jay, lived with her. Pursuant to an agreement between them, Mr. Harmon filed a suit for divorce from Audrey Harmon. The divorce decree would have been issued within several days after the death of Mrs. Harmon had her death not intervened.

Elsie M. Lingham is the mother of the decedent, Audrey E. Harmon, and the grandmother of Rhonda and Jay Tyler. Mrs. Lingham was always extremely close to her daughter, Audrey E. Harmon. Even while Mrs. Harmon was married to Ronald Lee Harmon, she and the children visited Mrs. Lingham in her home in Baltimore City on many, if not most weekends, and during various holidays throughout the year. After the separation between the decedent and Ronald Lee Harmon, she and her children visited Mrs. Lingham on an even more frequent basis. On a number of occasions, the children, Rhonda and Jay, were left in the care of Mrs. Lingham.

A few months prior to her death, Mrs. Harmon moved from Montgomery County, Maryland to Baltimore, where she, with the assistance of her mother, bought a house near her mother's residence. She and her mother shared numerous confidences, and it was assumed between them that, in the event of something happened to Mrs. Harmon, her mother, Mrs. Lingham, would care for the children, Rhonda and Jay.

In October, 1978, Mrs. Harmon told her mother, while both were attending a settlement at Loyola Federal Savings & Loan Association in connection with the purchase by Mrs. Harmon, with her mother's help, of a house, that she wanted to change the beneficiary of her life insurance at work to Mrs. Lingham "... and the children." In February, 1979, while on the way to a shopping center with her mother, Mrs. Harmon stated that she was going to have the beneficiary on the life insurance changed to Mrs. Lingham "... and the children." Since it

was assumed by Mrs. Harmon, in accordance with her many prior discussions with her mother, that the children, Rhonda and Jay, would live with Mrs. Lingham in the event that Mrs. Harmon predeceased her, it was natural for Mrs. Harmon to equate Mrs. Lingham as a beneficiary in behalf of the children with the children as the actual beneficiaries. In fact, in August of 1976, Mrs. Harmon made her mother the contingent beneficiary on the group life insurance plan, as well as on her employee's retirement system benefits and her lump sum sick leave death benefit, intending and believing that Mrs. Lingham would rear the children if her then husband did not survive her. *See* defendant's exhibit No. 1.

On February 14, 1979, Mrs. Harmon was admitted to Lutheran Hospital in Baltimore, Maryland, complaining of acute abdominal pain with vomiting and "loose stools." On that same day, in accordance with standard procedure at Lutheran Hospital, Mrs. Harmon appointed Mrs. Lingham as her "attorney–in–fact solely for the purpose of authorizing medical and surgical treatment during [her] stay at Lutheran Hospital in the event that, in the opinion of the attending physician [she was] unable to make an informed consent to a proposed medical or surgical treatment." (Plaintiff's Exhibit 1). The admission records of Lutheran Hospital, dated February 14, 1979, note in the "Patient's Social and Family History" section, as a result of information provided by Mrs. Harmon, that she was *single, divorced*, that her mother was caring for her family consisting of two children, and that her mother should be notified in the case of an emergency. (See plaintiff's exhibit No. 1). At that time, Mrs. Harmon did not believe that she had a life threatening illness. Following medical advice, Mrs. Harmon elected to have a gall bladder operation (cholecystectomy) and an appendectomy. The surgical procedures were performed on February 23, 1979.

Several days following the surgery, Mrs. Harmon became jaundiced and it was sus-

pected that an injury to the common bile duct had occurred during the first operation. On February 27, 1979, an exploratory laparotomy was performed and, as a result, a repair of the common bile duct was attempted.

After the second operation, the nurse's notes indicate that from time to time between February 28, 1979 and March 17, 1979, Mrs. Harmon became more and more apprehensive about her condition. On February 28, 1979, at 7:30 a. m., she said "I'm dying. I want my mother," after which the nurse attempted to calm the patient down and explain that the hospital staff was helping her. At 11:00 a. m. on that day, Mrs. Lingham is reported in the nurse's notes as having told the nurse that the patient was easily "agitated" and "high strung." The nurse noted that Mrs. Harmon needed much encouragement and reinforcement. Later that afternoon, Mrs. Lingham again visited her daughter who communicated nonverbally and appeared less apprehensive, as reported by the nurse. On March 2, 1979, in the morning, the nurse recorded that Mrs. Harmon appeared "extremely apprehensive" and that she was "allowed to verbalize [her] feelings." On March 6, 1979, late at night, the nurse recorded Mrs. Harmon as not being "very convinced about [her] medical progress" and that she needed "lots of reassuring." On March 7, 1979, she was recorded as stating that she was "getting worse instead of better." Although she stated that she was feeling fine at 2:30 p. m. on March 14, 1979, later that night the nurse's notes record that she was "crying loudly" but that she would not give any reason.

On March 7, 1979, it is recorded in the nurse's notes that the staff continued to make the patient aware of her progress and frequently explained to her all the procedures being undertaken in her behalf and that this appeared to help the patient. On March 17, 1979, at 10:00 a. m.,[1] Mrs. Harmon is recorded as voicing "unhappiness over the possibility of surgery." At 1:30 p.

---

1. Although the date is recorded in the notes as March 14, 1979, it is apparent that the recorded date is a mistake and that the actual date was March 17.

m. on March 17, 1979, the patient was recorded as remaining unhappy. She had visitors at 6:00 p. m. on that date.

Mrs. Lingham testified that, on that date, Mrs. Harmon told her that she had been told she was going to die and asked her mother to "please do whatever you have to do to have the insurance changed from Ron to you and the children." Mrs. Lingham reassured her that she would take care of everything and told her daughter "... not to worry about anything, sweetheart." The next day Mrs. Harmon signed a consent to an emergency exploratory laparotomy at which time extensive postoperative intestinal adhesions and obstructions were found, together with a beginning stricture of the common bile duct where the attempted repair had been made earlier.

After the operation on March 18, 1979, Mrs. Harmon was in critical condition and in great pain. She was on a respirator from that date until her death, a circumstance which prevented her from communicating orally. Although she was able to write as well as to mouth words after March 18, 1979, her ability to communicate with others by any means gradually deteriorated.

While it is unclear who told Mrs. Harmon that she might be dying, it is more probably true than not, and the court finds as a fact, that as of March 17, 1979, Mrs. Harmon believed that her condition was serious enough to result in her death. This may have been a result of her general condition, or it may have been as a result of an attempt on the part of members of the staff to be honest with her or to attempt to persuade her to agree to the operation the next day, or it may have been a combination of all these circumstances. In any event, the court has concluded that as of that date Mrs. Harmon finally had brought home to her the seriousness of her condition and that she could no longer procrastinate in having a change made in the beneficiaries of her life insurance to assure that her children, and not the person she regarded as her ex–husband, would benefit in the event of her death. She could not at that time

call the personnel office at her work since that day, March 17, 1979, was a Saturday. The personnel office of the Montgomery County Government is closed on Saturdays and Sundays. She turned to her mother, on whom she had relied on many other occasions, and requested her to do what was necessary to have the beneficiary changed. She told Mrs. Lingham that there was a change of beneficiary form at her home.

After the operation of March 18, 1979, the court is convinced from medical and psychological testimony which it heard, that Mrs. Harmon would have been able to sign a change of beneficiary form with the knowledge of what she was doing up to March 28, 1979, but thereafter she would not have been able either to sign or understand any such form. After she left the operating room on March 18, 1979, however, the court is further convinced from the medical and psychological testimony that Mrs. Harmon would not have been able to communicate with anyone the details of her insured status, the fact that she wished to change the beneficiary, nor, in short, the necessary information which would have been required to set in motion the machinery for a change of beneficiary.

Mrs. Harmon relied upon her mother on March 17, to do what was necessary to accomplish the change of beneficiary. Unfortunately, however, Mrs. Lingham was unable to bring herself to get a change of beneficiary form to bring to her daughter for her signature, because Mrs. Lingham did not want to speak to her daughter of death, but rather of life. This attitude on the part of Mrs. Lingham was corroborated by the nurse's notes which have been cited above.

On March 23, 1979, Mrs. Harmon was transferred from Lutheran Hospital to Maryland General Hospital, where she remained until her death. On approximately April 10, 1979, Mrs. Harmon lapsed into a comatose condition.

Mrs. Lingham finally concluded that her daughter was going to die, much as she did not wish to believe it. She attempted to find the change of beneficiary form at her

daughter's home, but was unable to do so.[2] She then contacted an attorney through a friend of Mrs. Harmon and a co–employee on April 18, 1979. Knowing that her daughter was then comatose and unable to sign the form, Mrs. Lingham signed the form on behalf of her daughter to carry out the instructions which she had been given on March 17, 1979. From the beginning of the period of hospitalization of Mrs. Harmon, the children had lived with her and remain with her up to this date. Knowing that it was her daughter's intention that she be the guardian of the children, but that the children be the beneficiaries of the policy, the change of beneficiary form was executed by Mrs. Lingham on April 19, 1979 in such a way as to make the children the beneficiaries.[3]

On April 20, 1979, Mrs. Harmon died at the Maryland General Hospital without regaining consciousness. Shortly thereafter the change of beneficiary form, which had been signed by Mrs. Lingham on behalf of Mrs. Harmon, was filed with the Personnel Office of the Montgomery County Government.

It has been stipulated that Mrs. Lingham, the plaintiff, was made the guardian of the two children at the death of Mrs. Harmon and that she remained the guardian until the date of this trial, although Rhonda Tyler recently came of age.

Since Mrs. Lingham, on behalf of the children, and Mr. Harmon, in his own behalf, each claimed to be the primary beneficiary under the group insurance policy, this interpleader action was filed.

## II. Law

■ The testimony of Mrs. Lingham concerning the statements made to her by her daughter, Mrs. Harmon, was not rendered inadmissible under Md.Cts. and Jud. Proc. Code Ann. § 9–116, commonly referred to as the "Dead Man's Statute."

*Sheeler v. Sheeler*, 207 Md. 264, 269, 114 A.2d 62 (1955). The testimony as to Mrs. Harmon's statements to her mother was admissible as an exception to the Hearsay Rule under F.R.Evid. 803(3). The direction of the decedent to her mother to "do what was necessary" is not hearsay, since it was not offered in evidence to prove the truth of what was asserted in the statement by Mrs. Harmon, F.R.Evid. 801(c).

■ Under the insurance policy in this case, a change of beneficiary form, if otherwise valid, would take effect from the date of the execution of the form even if the form were received by the insurance company or its agent after the death of the insured. There is no dispute that the form which was signed by Mrs. Lingham was a "form satisfactory to the insurance company." It is also undisputed that the terms of the insurance policy did not require that a beneficiary, or the company itself, consent to a change of beneficiary. Under the policy, the insured had an absolute right to change the beneficiary. The legal question, therefore, present in this case is whether the words of the policy requiring that the form be "signed by the employee" preclude the change of beneficiary from being effective under the circumstances of this case.

In *Daly v. Daly*, 138 Md. 155, 113 A. 643 (1921), the Court of Appeals of Maryland recognized the "equitable rule" that when an insured " '... has complied with all of the requirements of the rules for the purposes of making a substitution of beneficiaries within his power, he has done all that a court of equity demands.' " 138 Md. at 166, 113 A. 643, *quoting* 14 R.C.L., § 556. In the *Daly* case the insured, under an insurance policy provided by his employer, shortly after he married applied to an agent of the insurance company to make a change in the insurance certificate to make his wife the beneficiary, but was advised that the agent did not have the change of benefi-

---

**2.** It is stipulated that, subsequent to Mrs. Harmon's death, a blank change of beneficiary form was found by Mrs. Lingham in Mrs. Harmon's home.

**3.** The change of beneficiary form was a form "... satisfactory to the insurance company" and was signed "Audrey Harmon, by Elsie Lingham as mother and next friend and agent." (PX 5).

ciary blanks at that time. The agent promised that he would give the insured, Mr. Daly, a change of insurance blank as soon as he got one, but he neglected to do so before Mr. Daly's unexpected death about a month later. The Maryland court, under those circumstances, stated as follows:

"There can be no doubt of the insured's desire and intention to change the beneficiary or that he did all in his power to effect the change, and the only reason a more formal application was not made, and noted on the insurance register of the Society, was because the Society for the employer had failed to furnish its or their agent the blanks used for that purpose, or because its or their agent failed to give him a blank in accordance with his promise to do so. Under these circumstances the claim of [the father of the insured], whose interest in the policy was subject to the right of the insured to change the beneficiary, should not be allowed to prevail over that of his widow, for whom the insured clearly intended the fruits of his policy, and to whom it should be awarded by a court of equity upon the principle we have stated."

In other circumstances, as for instance where a beneficiary, who has only a revocable interest in the policy, refuses to surrender possession of the policy to the insured, thereby precluding the insured from following the rule of the insurance company requiring a surrender of the policy for endorsement of a change of beneficiary, courts have required only that there be a showing of an intention on the part of the insured to change the beneficiary and that the insured has done "... all in his power to effectuate the change." *Durst v. Durst*, 232 Md. 311, 317, 193 A.2d 26 (1963).

The great weight of authority in this country appears to endorse the general principle that the insured, in order for the change of beneficiary to be effective, must have determined to change the beneficiary and must have done everything to the best of his ability thereafter to effect the change, *Tomaneng v. Reeves*, 180 F.2d 208 (6th Cir. 1950); *Mitchell v. United States*,

165 F.2d 758 (5th Cir. 1948); *Prudential Insurance Company of America v. Moore*, 145 F.2d 580 (7th Cir. 1944), *cert. denied*, *Moore v. Moore*, 324 U.S. 849, 65 S.Ct. 686, 89 L.Ed. 1409 (1945); *Mitchell v. Mitchell*, 126 Ga.App. 664, 191 S.E.2d 587 (1972).

In *United Services Life Insurance v. Moss*, 303 F.Supp. 72 (W.D.Va. 1969), Chief Judge Dalton, in declining to give effect to a change of beneficiary form, determined factually that the insured did not intend to change his beneficiary and, furthermore, that the fact that the insured had held the change of beneficiary form for over two and a half years without submitting it to the insurance company, in the absence of an explanation, was indication that he had not done everything to the best of his ability to effect a change. Chief Judge Dalton went on to conclude that if the failure to deliver the change of beneficiary form to the insurance company was due to the negligence of the insured, or was unexplained, the change of beneficiary would not be held to be effective. The *United Services Life Insurance* case is distinguishable from the present case in that here the court has found that the insured did intend to change her beneficiary and, in addition, that it was not her negligence or inaction from March 17, 1979, forward, but rather it was the inaction or negligence of her mother, which prevented the change of beneficiary from being accomplished by the insured's own signature.

In the case of *Urquhart v. Alexander*, 218 Md. 405, 147 A.2d 213 (1958), the Court of Appeals of Maryland held that "a mere unexecuted intent to substitute a new beneficiary is not enough, without more, to effect such change." 218 Md. at 414, 147 A.2d 213. In that case a decedent had said several times that he would make his wife a beneficiary of his insurance policy when a loan to his employer for which the insurance policy had been pledged as collateral was repaid. The loan was repaid but no change was made in the beneficiary prior to his death. In holding that the widow was not the beneficiary under the policy, the court said that "... the insured made no

attempt at any time, either directly or otherwise, to effect a delivery of the policy to his wife." *Id.* at 414, 147 A.2d 213. The *Urquhart* case is distinguishable from the present situation in that here the decedent, Mrs. Harmon, did direct her mother to do what was necessary to accomplish the change of beneficiary. Thereafter, due to her physical condition, she was completely dependent upon her mother to obtain the change of beneficiary form and to bring it to her to sign. In the unusual circumstances of the present case, Mrs. Harmon did all in her power that she could do, once having finally determined to change the beneficiary.

In the present case, the insurance company had no discretionary power to approve a change of beneficiary. The right of the insured, Mrs. Harmon, to change her beneficiary was unencumbered and without limitation, provided that she substantially complied with the rules of the insurance company in signing the change of beneficiary form. These circumstances distinguish the present case from *Maccabees v. Lipps*, 182 Md. 190, 34 A.2d 424 (1943), and cases cited therein.

This court has been unable to find any reported decision giving effect to a change of beneficiary form which was not signed by the decedent insured. Where the rules of the insurance company, however, allow the form to be filed subsequent to the death of the insured, and where the insurance company has not itself declared that it would not recognize the purported change of beneficiary form but, instead, has left it up to the court to determine, and where there is clear and convincing evidence, as there is here, that the decedent insured *intended* to change the beneficiary of the policy, and gave instructions to a third party to do what was necessary, but the process was never completed due to the failure of third party to do "what was necessary," and where the decedent insured was physically unable thereafter to accomplish the change of beneficiary by herself, the court believes that the principles enumerated in the equitable rule recited above have been satisfied.

Accordingly, the court has found that the requirements of the insurance policy were substantially complied with, and that the decedent, Mrs. Harmon, did intend to change her beneficiary on the insurance policy to her children, and having determined on March 17, 1979 to take action to carry out her intention, did all that she could reasonably have done thereafter under the circumstances.

Judgment will be entered in behalf of Rhonda Tyler, who will be substituted as a party plaintiff in accordance with the evidence in this case, and Elsie M. Lingham, as Guardian of James a/k/a Jay Tyler, against the defendant, Ronald Lee Harmon, declaring that the above plaintiffs are entitled to the insurance proceeds of the aforesaid group insurance policy.